MEAD DIGITAL SYSTEMS, INC., Plaintiff,

v.

A. B. DICK COMPANY and Gould, Inc., Defendants.

A. B. DICK COMPANY and Gould, Inc., Plaintiffs,

v.

The MEAD CORPORATION, Defendant.

Nos. C–3–78–177, C–3–78–287.

United States District Court, S. D. Ohio, W. D.

Aug. 7, 1981.

David C. Greer, Howard P. Krisher, Dayton, Ohio, Dugald S. McDougall, Keith V. Rockey, Chicago, Ill., for A. B. Dick Company & Gould, Inc.

Armistead W. Gilliam, Jr., Dayton, Ohio, Bill Durkee, Edward W. Goldstein, Ben D. Tobor, Houston, Tex., for Mead Corp.

## OPINION

PRELIMINARY MATTERS DISPOSED OF; A. B. DICK NOT PRECLUDED FROM PROSECUTING INFRINGE-MENT ACTION BY LACHES; MEAD *DIJIT* PRINTER HELD NOT TO IN-FRINGE, LITERALLY OR AS AN EQUIVALENT, ON CLAIMS 1 OR 33 OF SWEET PATENT OR ON CLAIM 2 OF LEWIS–BROWN PATENT; SWEET PATENT DEEMED VALID; LEWIS–BROWN PATENT DEEMED INVALID; DEFENDANT TO PRE-PARE JUDGMENT ENTRY WITHIN STATED PERIOD OF TIME IN AC-CORDANCE WITH THIS OPINION

RICE, District Judge.

### I.

This case brings before the Court two patents in the field of ink jet printing and a device, the Mead DIJIT printer, which is alleged to infringe on those patents. The case came on for trial before the Court sitting as the trier of fact. Certain preliminary matters are addressed immediately below. The Court's findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52(a), are set forth further below.

### II.

Because one of the patents in suit (the Sweet patent) was developed in the course of a research project sponsored by the United States Government, Mead says that the Government has equitable title thereto under the common law and pursuant to federal regulations. Since the Government is not a party to this action in infringement, and since the law requires that every owner of a patent must be joined before an infringement suit can be maintained, Mead contends that this action in infringement of that patent cannot be maintained.

■ Although, as Mead points out, there is a conflict among reported decisions on this matter, this Court must conclude, in accord with the great weight of authority, that the equitable interest of a third party in a patent may not be asserted as a defense in an action for infringement brought by the owner of legal title to the patent. *See Mercantile Nat'l Bank of Chicago v. Howmet Corp.*, 524 F.2d 1031, 1034 (7th Cir. 1975), *cert. denied*, 424 U.S. 957, 96 S.Ct. 1435, 47 L.Ed.2d 364 (1976), and cases cited therein. The Court also notes that Mead raised and then abandoned the idea of joining the Government as a party, herein, in order to determine the extent of the Government's interest in the patent. This Court concludes that it is without jurisdiction to consider Mead's claim that title is in the government. *See also Mead Corporation and Mead Digital Systems, Inc. v. United States of America, et al.*, 652 F.2d 1050 (D.C.Cir.1981).

Accordingly, the Court does not consider the question of the Government's interest in the Sweet patent in the findings and conclusions set forth below.

After the close of the evidence in this case, plaintiffs * moved for an order enlarging the record by the addition of two exhibits. Mead does not object to the addition of the first exhibit, the Donahue deposition, and accordingly, it will be added to the record as plaintiffs' exhibit A–237. The Court notes, in passing, that plaintiffs rely on this exhibit as evidence of Mead's interest in acquiring a license under one of the patents in suit (Lewis-Brown), and to challenge Mead's assertion in its brief that plaintiffs proposed findings were incorrect on this matter. Since the Court finds and concludes below that the accused device does not literally infringe, nor infringe as an equivalent of that patent, the question of Mead's interest in the patent during the development of the accused device is wholly irrelevant.

▮ Mead does object to the second exhibit which plaintiffs seek to have added to the record. Plaintiffs seek to have the second exhibit added on grounds that the failure to offer it at trial was "inadvertent." The exhibit in question was originally marked as a Mead exhibit but was withdrawn by Mead at the trial's end. Plaintiffs were given the opportunity to adopt the exhibit but declined to do so. Plaintiffs now seek to rely on the exhibit to defend against Mead's assertion that one of the patents in suit (Sweet) is invalid.

Under the circumstances, the Court is not satisfied that Plaintiffs' failure to offer the exhibit at the close of trial was inadvertent. Accordingly, the exhibit will not now be added to the record. However, while the Court notes that the exhibit is relevant to the issue of one of the inventor's disclosures to the patent office, the Court further notes that the exclusion of the exhibit does not prejudice plaintiffs since the Court finds and concludes below that the particular disclosure in question (or, more correctly, failure to disclose) does not affect the validity of the inventor's patent.

Finally, it will be noted that the Court finds and concludes below that the accused device does not infringe either of the patents in suit. Although it is not necessary to address the *validity* of the patents in suit under such circumstances, the Court is of the opinion that the public importance of and public interest in the validity of the patents in suit, as well as the substantial cost borne by the parties in litigating the matter, dictate that the Court determine the validity issues presented to it. The Court notes that such comprehensive disposition of infringement suits has been approved in this Circuit as "the better procedure." *Tappan Co. v. General Motors Corp.*, 380 F.2d 888, 890 (6th Cir. 1967).

### III.

### Findings of Fact

A. *The Parties, Patents in Suit, and Proceedings*

1. A. B. Dick Company (hereafter "A. B. Dick") is a Delaware corporation, having its principal place of business in Chicago, Illinois. Gould, Inc. (hereafter "Gould") is also a Delaware corporation, and has its principal place of business in Rolling Meadows, Illinois.

2. The Mead Corporation is an Ohio corporation, having its principal place of business in Dayton, Ohio. Mead Digital Systems, Inc., also an Ohio corporation, is a wholly-owned subsidiary of The Mead Corporation. For sake of brevity, The Mead Corporation and Mead Digital Systems, Inc., will be referred to collectively as "Mead."

3. All the parties have a regular and established place of business in the Southern District of Ohio. No issue as to jurisdiction or venue is involved.

4. United States Patent No. 3,596,275 (the "Sweet patent") issued on July 27, 1971, on an application filed on March 25, 1964. That application was called a contin-

---

* Because this action is a consolidation of two cases, one of which involves A. B. Dick and Gould as Plaintiffs and the other of which includes Mead as Plaintiff, the parties have agreed that, for purposes of the trial, A. B. Dick and Gould would be referred to as Plaintiffs and Mead as Defendant. (Pg. 2, Final Pretrial Order, 10/29/80).

uation-in-part of an earlier application filed July 31, 1963. On September 19, 1972, the inventor named in that patent, Richard G. Sweet, executed an assignment conveying his entire right, title and interest in U. S. Patent No. 3,596,275 to A. B. Dick.

5. United States Patent No. 3,298,030 (the "Lewis-Brown patent") issued on January 10, 1967, on an application filed July 12, 1965, and names Arthur M. Lewis and Arling Dix Brown as the inventors. That application was called a continuation-in-part of an earlier application filed on January 13, 1965, which in turn was called a continuation-in-part of yet an earlier application filed September 25, 1964. Gould is the owner of that patent, and A. B. Dick is the exclusive licensee under it.

6. A. B. Dick and Gould first filed suit in Chicago against The Mead Corporation for infringement of the Sweet patent and the Lewis-Brown patent, based upon Mead's development and use of a printing system called the DIJIT printer. Mead Digital Systems, Inc., thereafter filed an action for declaratory judgment before this Court, seeking a declaration that Mead Digital Systems, Inc., has not infringed either of the patents in suit. (Case No. C–3–78–177). The Chicago case was, with the consent of all the parties, transferred to this Court where it was consolidated with the declaratory judgment action brought here by Mead Digital Systems, Inc. (Case No. C–3–78–287).

B. *The Art Prior to Sweet*

7. In the 19th century, Lord Rayleigh investigated the scientific phenomenon that a stream of liquid drops issuing from a nozzle could be made uniform in size and spacing by imparting cyclic energy (vibrations) to the liquid as the drops formed at the nozzle tip.

8. The basic concept of recording electric signals on paper with a controlled jet of ink has been known for some years. In claim 4 of the Schroter Patent, No. 1,882,-043, which issued in 1932, one aspect of the Schroter invention is described as follows:

The method of recording signals on a recording surface in accordance with received signal energy impulses which includes continuously projecting a jet of recording fluid along a predetermined path toward the recording surface, electrically deflecting the path of the recording jet in accordance with received signal energy impulses, producing markings by the recording jet upon the recording surface during periods of deflection, and interrupting the marking action during the absence of electrical effects producing deflections in the jet.

The Schroter patent also discloses the concept of moving the paper past the jet to effect recording (e. g., claim 8). The Schroter patent does not discuss use of a jet consisting of a succession of uniform ink droplets, but it does disclose that electric signals for recording can be used either to control the instantaneous intensity of charge of the jet or to control the intensity of the deflecting electric field.

9. The Jacob patent, No. 2,577,894, issued in 1951, discloses an ink jet system operated in a binary or on-off manner in which ink or other marking medium is directed to a recording surface with one charge value, or is intercepted before recording by another charge value at a different level. Jacob's device contemplates recording electronic signals through the use of a marking mist or spray consisting of a jet of air containing ink particles.

10. In 1956, Harold Waage at Princeton University published his observation that a uniform succession of water droplets could be produced, in accordance with the principles of Lord Rayleigh, and that the droplets could then be deflected in an electrostatic field in a manner analogous to deflection of electrons in a cathode ray tube. The report of Waage's experiments did not suggest a recording use, but only primary observation of the characteristic movements of the droplets under a stroboscope and with mirrors.

11. Between 1956 and 1962, R. H. Magarvey published studies, first with B. W. Taylor and then with B. L. Blackford, in the area of inducing charges on water drops.

The Magarvey art concerns induction charging of individual water droplets produced by a vibrated nozzle, and describes a device and experiments which involve the breakup of water from a nozzle and headphone arrangement into a stream of uniformly sized and spaced droplets; an induction ring which charges drops passing through it; a manually varied voltage supply to the induction ring; an electrode for electrostatically deflecting the charged drops as a function of the charge of the drops; and a collector for receiving the charged drops. In the earlier Magarvey studies, in 1956, he deflected charged water droplets in a varying electrostatic field to separate some droplets from others which were intercepted. Magarvey also added blue aniline dye to the water to aid photography of the droplets against a white background. Magarvey did not disclose any printing or recording use for his device.

12. In the late 1950's, Charles R. Winston at Teletype Corporation made an ink jet printer which sold commercially for several years as the Teletype Inktronic. U. S. Patent No. 3,060,429 issued to Winston in 1962 based on a disclosure filed in 1958. The Winston printer involved an ink supply under slight fluid pressure, formation of uniform highly charged ink droplets, movement of paper across the path of the ink droplets for marking, deflection of some ink droplets to intercept them and to keep them from marking the paper, and controlled electrostatic deflection of other ink droplets to effect marking at the proper location on the paper. It also included a function generator to vary the strength of the electrostatic field through which the ink drop passes. Variations of the strength of that field caused the drops to deflect varying amounts and to strike the paper in the correct place. The Winston printer did not employ a constant stream of ink droplets formed by fluid pressure; rather, it employed an attractive electrostatic force, located on the opposite side of the paper from the nozzle, to draw the ink droplets from the nozzle whenever ink droplets were desired. Although Teletype Corporation has discontinued sale of the Winston printer, some of the printers are still in use today.

## C. *Sweet's Work and Related Activities*

13. Richard G. Sweet is an electrical engineer, conducting electronics research in the laboratories of Stanford University. In 1961, Sweet was given, as a gift, an aquarium equipped with an air stone for putting oxygen into the water for the fish to breathe. Being a curious scientist, Sweet wondered how oxygen from the air was transferred from the bubbles released into the aquarium to the water, and did some research to find out. That research led Sweet to an old book entitled *Soap Bubbles*, based on lectures given in England in the 1890's by Sir Charles Boys. That book contained a chapter describing how a small fluid jet broke up into uniformly spaced and sized droplets which could be electrostatically deflected. Boys had used a tuning fork to vibrate the nozzle to produce disturbances on the fluid jet and to cause it to break up into the stream of uniform droplets.

14. Sweet was intrigued by Boys' experiments, having in mind:

" . . . a rather vague idea that one of the vague applications of this might be some kind of writing device in which the droplets, since they were very small, it might be possible to move them more rapidly than one could move a mechanical system such as those that I was familiar with."

Sweet was familiar with, for example, moving pen recorders of the kind used to make electrocardiograms. Sweet conducted experiments repeating Boys' work.

15. Sweet's initial thought was to apply an intelligence or information signal to a deflection mechanism so that droplets would be deflected in the same fashion as electrons are deflected in a cathode ray tube. That did not work well, however; because of the slow speed and large mass of inkdrops as compared to electrons, that type of deflection system had a very low frequency response. So Sweet searched his mind for a better way; he testified:

"And it was at that point that I was searching for some way to get around

that limitation, that the idea of actually charging the droplets and having the droplets carrying the information occurred to me."

16. Sweet next undertook to determine the physics of the drop-charging process, a phenomenon not clear to him from Boys' work. Sweet discovered that, unlike Boys who charged and deflected droplets with a single electrode, he could charge the droplets separately from the deflection process by providing a separate electrode to charge the droplets before they were deflected. That convinced Sweet that he had something; in such a device, the frequency response would depend only on the rate at which droplets could be formed. All that was necessary was that the charging electrode be at the desired voltage at the instant the droplet was formed; after the droplet was formed, its charge was "fixed."

17. At that point in early 1961, Sweet assembled "a very crude system" consisting of a nozzle fed with tap water, a miniature loud speaker to stimulate the nozzle, a charging electrode and a pair of deflection plates, to enable Sweet to study the trajectories of the deflected droplets and to learn how they responded to various signal waveforms applied as charges to the droplets. That system was sketched in Sweet's laboratory notebook in July of 1961.

18. Sweet had kept his group leader, R. C. Cumming of the Stanford Electronics Laboratory, fully apprised of what he had been doing in this research. Cumming expressed interest, and suggested that the two of them approach the Army Signal Corps, with whom Stanford already had a research contract, to see if the Signal Corps would provide financial support for Sweet's project.

19. The contract monitor for that contract, Ira O. Myers of the Army Signal Corps, paid Sweet and Cumming a visit in the month following the date of Sweet's sketch. Sweet showed Myers his crude apparatus, hoping that Myers would give him some encouragement. Myers expressed interest and asked Sweet for a formal proposal. On September 13, 1961, Cumming wrote to Myers, forwarding to him Sweet's written proposal.

20. Myers responded promptly, suggesting that a working model be fabricated for laboratory testing. The project was then formally established, and in early 1962 Sweet began his experimental work under the auspices of the Army Signal Corps.

21. Under the Signal Corps Contract, quarterly technical reports were required concerning the Sweet project.

22. The quarterly reports on the Sweet project were combined each quarter with reports on other projects in a consolidated report, designated a Consolidated Quarterly Status Report ("CQSR"). The first relevant CQSR, namely, report No. 31, was distributed by Stanford University and received prior to July 31, 1962, by the private and governmental organizations, libraries, universities, persons, and other entities listed in its distribution list appearing at the end of the CQSR.

23. The second and third relevant CQSRs, namely reports Nos. 32 and 33, were distributed by Stanford University and received prior to March 25, 1963, by the numerous organizations, libraries, universities, persons, and other entities listed in their respective distribution lists.

24. All of the quarterly reports on the Sweet project were unclassified. Even though the CQSRs were confidential, the individual Sweet quarterly reports all bear the word UNCLASSIFIED with the title.

25. Sweet's project under the Signal Corps Contract was not at any time assigned any Government security classification. While Sweet's work was carried out in a building of the Stanford Electronics Laboratories in which classified research was being carried out, visitors without security clearance were permitted in the area of Mr. Sweet's work, and Mr. Sweet was free to demonstrate his work to anyone.

26. Sweet's first job in the laboratory, upon obtaining the government contract, was to increase the droplet frequency, that is, the rate at which the droplets issued from the ink nozzle. The prior work of

Boys, and other literature references tracked down by Sweet, described liquid jets having droplet frequencies of a few hundred drops per second. Sweet, in contrast, was interested in droplet rates greater than 20,000 per second. Within a very short time, Sweet succeeded in producing 100,000 droplets per second, a rate he found suitable for recording. He made his first record in April of 1962.

27. Sweet's first record was a replication of a sine-wave input signal, a type of signal readily available in the laboratory and commonly used by engineers to evaluate the frequency response of electronic equipment.

28. Annual Contractors and Stanford Technical Advisory Committee (TAC) meetings were held at Stanford University each August during the early 1960's to demonstrate the research products developed at Stanford to those who attended the meetings. Those meetings were attended by members of Stanford's Technical Advisory Committee and by representatives of Government contractors, on an invitation-only basis. Sweet's laboratory was located in an area secured by guards, to protect the security of classified work which was being conducted there.

29. By the time of the annual Contractors and TAC meetings in August, 1962, Mr. Sweet's recorder had been reduced to practice and he demonstrated a model of the recorder at those meetings. These demonstrations were open to all attendees at the meetings who were interested in seeing it. In addition to the actual demonstration, Mr. Sweet had copies of waveforms posted in the area of his demonstration.

30. There were no constraints of any kind placed upon the attendees at the 1962 Contractors and TAC meetings, as to their subsequent disclosure or use of any information they obtained concerning the Sweet recorder or the Sweet project.

31. Some time after the August, 1962, TAC meeting, Sweet observed that when this input signal was changing rapidly, an error resulted in the charge on one drop of ink. That drop, as a result, would not strike the paper precisely where it was supposed to. Sweet corrected that condition by wiring into his system a standard compensating or tone-control circuit like that employed in audio systems.

32. After the Sweet direct-writing oscillograph had been reduced to practice, and had been demonstrated at the August, 1962, Contractors and TAC meetings, Sweet contacted various industry members to interest them in commercializing his recorder.

33. In October and November, 1962, Sweet sent letters to several manufacturers of recording instruments, for the purpose of finding:

"... a commercial concern that would do some development of the system to commercialize it and hopefully under some kind of [licensing] arrangement with me."

Such letters were sent to Brush Instruments, Honeywell, and Hewlett-Packard, among others.

34. Sweet ultimately granted an exclusive license to his invention to Honeywell. The Honeywell license obligated Sweet to submit to Honeywell a complete disclosure of his invention. He did so on March 6, 1963.

35. Sweet's disclosure to Honeywell outlined what his invention was and how it worked. He noted that his invention contained the following elements:

(a) A means for supplying ink under pressure;

(b) A "nozzle or orifice" from which the ink issues as a "free jet";

(c) A means "for causing the jet to break up into regularly-spaced droplets of uniform size";

(d) A charging electrode for charging the ink droplets in proportion to the signal to be recorded;

(e) A deflection system to deflect the charged droplets, utilizing "a uniform DC electric field";

(f) A recording device on which the record can be made; and

(g) A transport system to advance the record surface during recording.

36. In his Honeywell report, Sweet noted several "possible modifications and variations" to the basic system. One was a means of diverting from the record surface a portion of the ink issued from the nozzle to control the intensity and width of the recorded trace. Unwanted or excess ink droplets, Sweet noted, could be disposed of by simply deflecting them to a catcher, without their ever reaching the record member. That deflection technique for intensity control was still on the drawing board, however, as Sweet noted that it was a feature which was being tested.

37. In the period following his entering into a contract with Honeywell, Sweet continued to test his system. For example, by March 31, 1963, Sweet had reported tests of his catcher.

D. *The Sweet Patent Applications*

38. Sweet's agreement with Honeywell provided that Honeywell would prepare and file, on Sweet's behalf, patent applications on Sweet's invention. Honeywell's rights were, however, subject to the right of the U.S. Government to receive a royalty-free license.

39. The first Sweet patent application was filed by Honeywell on Sweet's behalf on July 31, 1963. It disclosed the same device, which Sweet had demonstrated at the TAC and Contractors meetings in August of 1962.

40. That first Sweet patent application did not include a disclosure of the concept of, or apparatus for, deflecting ink droplets to a catcher. At the time the first application was filed, that concept was still in the evaluation stage. Later in 1963, Sweet visited Honeywell's facilities in Denver on a regularly-scheduled consultation visit, at which time it was decided that deflection to a catcher was a valuable improvement which should be included in Sweet's patent. A continuation-in-part (CIP) application to that end was filed on March 31, 1964, and the first application was thereupon abandoned in favor of its successor.

41. The second Sweet patent application, Serial No. 354,659, included all of the disclosure of the original application plus some new drawings and descriptive text relating to them. The new disclosure thus added to the CIP application material related to the catcher, its associated circuitry, and its utility in disposing of unwanted ink drops.

42. During the course of the prosecution of the Sweet CIP application, the Patent Office examiner cited a number of prior-art references, many of which are relied upon by Mead. After a lengthy prosecution, the Patent Office allowed the Sweet CIP application, and it issued on July 27, 1971, as U. S. Patent No. 3,596,275.

43. Although Sweet knew of Waage's work (Finding of Fact # 10, page 6, *supra*) as early as 1962, he did not cite it to the patent office during the prosecution of his application. Sweet wrote to his attorney in 1970 that he considered the Waage publication to be the "closest prior art" in the field of drop generation for purposes other than writing or recording.

44. Mr. Sweet testified that he knew during the development of his device that it was "critical" that ink having the correct properties be used in the device in order to achieve proper operation. However, he further testified that he had found that every ink he had used "that would squirt through the nozzle worked satisfactorily." There was no disclosure regarding ink properties in either the first or the second Sweet patent applications.

45. Mr. Sweet also testified that his "best system" prior to the filing of his first patent application included a compensating network for drop-placement error. (See Finding of Fact # 31, page 12, *supra*). However, he further testified that he thought the compensating circuit "usually was not needed." There was no disclosure regarding ink properties in either the first or the second Sweet patent applications.

46. Sweet's license to Honeywell had continued as an exclusive license until September, 1965, when Honeywell converted it to a non-exclusive license. On September 9, 1969, Honeywell terminated its non-exclusive license.

47. A. B. Dick had first become a licensee of the Sweet invention in May, 1966. Thereafter, on September 19, 1972, A. B. Dick bought Sweet's patent outright, subject to other licenses earlier granted.

### E. *The Sweet Patent*

48. A waveform is the pictorial representation of the form or shape of a wave with respect to time.

49. The Sweet patent describes a recording system in which the waveform of an incoming electrical signal is recorded on paper.

50. The waveform is recorded, in accordance with the Sweet patent disclosures, by the imprint of uncharged and variably charged ink droplets on various positions on a paper. In every embodiment disclosed in the Sweet patent, the waveform of a continuously varying signal is recorded by a process which involves: charging each ink droplet in a succession of droplets in proportion to the instantaneous value, including zero, of an electric signal which varies as a function of time; and then passing the variably charged droplets through a constant deflection field to deflect the droplets through variable trajectories in order to produce on the paper a trace of the incoming waveform.

51. As defined by the McGraw-Hill Encyclopedia of Science and Technology, an oscillograph is:

A measurement device for determining waveform by recording the instantaneous values of a quantity such as voltage, as a function of time. It consists of three major components: (1) a primary detector for sensing the instantaneous values of the quantity, (2) the timing system for introducing a time scale on the record, and (3) some means for recording the waveform.

52. The testimony at trial was consistent that the Sweet patent discloses only an oscillographic device.

53. Richard G. Sweet, the inventor of the patent, testified:

Q. Sir, isn't it true that the only direct writing recorder disclosed in your patent is an oscillograph?

A. As we defined it, yes.

54. Dr. Joseph M. Crowley, an expert witness called by A. B. Dick, testified:

Q. Is there anything disclosed in the Sweet patent which shows anything other than an oscillograph?

A. I don't recall anything.

55. Mr. Lockwood Burton, the attorney who drafted the Sweet patent, testified:

Q. Did you consider that Mr. Sweet had developed an invention in the field of oscillography?

A. Yes.

Q. In any other field?

A. No other field was concerned.

56. Dr. Charles Hendricks, an expert witness called by Mead, testified:

Q. Does the Sweet patent disclose an oscillograph?

A. Yes, it does.

Q. Does it disclose any other kind of device?

A. No.

57. The Sweet patent discloses a direct writing oscillograph for directly recording on paper a picture of the waveform of an electrical signal as a function of time. The Sweet patented device reproduces an apparently cursive waveform of the incoming signal. It is not capable of printing pictures of something other than a waveform.

58. In the Sweet patent, interception and collection of some of the droplets by deflection to a catcher serves only the purpose of controlling intensity of the trace to prevent puddling associated with excess ink when the paper is moving slowly or where the waveform is not changing quickly. Under such circumstances, a cursive representation of the incoming signal or waveform is still recorded; the cursive trace on paper is a cleaner representation of the incoming signal due to the elimination of puddling.

Technically, the apparently cursive waveform produced by the Sweet device is discontinuous, in that it is composed of discrete droplet imprints rather than a contin-

uous stream. However, the waveform produced by the Sweet device appears continuous by virtue of the overlapping or close juxtaposition of the droplet imprints. The interception facility in the patented Sweet device does not serve the purpose of creating an apparent discontinuity in any portion of the waveform, but only to adjust the density of the waveform by increasing the distance between droplet imprints.

59. The Sweet patent discloses deflection of the charged drops in a direction transverse to the time axis of the trace, which ordinarily is transverse with respect to the direction of relative movement between the paper and the nozzle. Such transverse deflection is essential in order to operate the device of the Sweet patent to record a waveform on paper. Sweet does not disclose, or illustrate in any embodiment, a deflection of the drops other than in this direction. Deflection of the charged drops longitudinally with respect to the relative movement between the paper and the nozzle in the oscillograph disclosed by Sweet would produce an inoperative device.

60. Certain embodiments in the Sweet patent do disclose deflection of charged drops longitudinally with respect to the relative movement between the paper and the device as a whole. However, in each such embodiment, the nozzle rotates and the direction of the deflection remains substantially transverse the time axis of the trace, which is substantially transverse of the direction of relative movement between the nozzle and the paper.

61. Claims 1 and 33 of the Sweet patent are the only claims of that patent asserted against Mead in this case. Both claims describe charging each droplet in a single file succession, with the magnitude of each charge being proportional to the instantaneous value of an electric signal which varies as a function of time, and deflecting the droplets to take different trajectories as a function of the magnitude of charge associated with the droplet so that the droplets form a trace characteristic of the variable input signal on the recording surface. This description refers to oscillographic recording and is consistent with the overall disclosure of the Sweet patent.

62. Claim 1 specifically requires that charged drops be deflected "laterally." This term is ambiguous since alone it may mean deflection "lateral" of the undisturbed stream of droplets emitting from the nozzle, including deflection longitudinal of the relative movement between the nozzle and the paper, or it may only mean deflection "lateral" of the relative movement between the nozzle and the paper.

63. Claim 33 requires deflection of charged droplets along different "trajectories" for collection in different "regions" of the collecting device. This claim is ambiguous in the same manner as claim 1.

64. The Sweet patent only discloses deflection of charged droplets in a direction transverse of the direction of relative movement between the paper and the nozzle, and both claims must be read in light of this limited disclosure. Deflection of ink droplets in a direction longitudinal of the direction of relative movement between the paper and nozzle would cause the device disclosed in the Sweet patent to be inoperative.

65. Claims 1 and 33 of the Sweet patent describe an oscillographic method and recorder.

66. The construction of the Sweet patent and its claims as limited to oscillography is also consistent with the history of prosecution before the Patent Office of the 1964 application which became the Sweet patent.

67. In examining the Sweet application on July 31, 1970, the Examiner rejected applications claims 30 and 51, which became respectively claims 33 and 1 of the Sweet patent, as being "fully met" by the Magarvey and Blackford study. (See Finding of Fact # 11, page 6, supra). It was the position of the Examiner that the Magarvey and Blackford publication taught each feature of claims 30 and 51 of the Sweet application.

68. In response to the rejection of the claims as fully met by Magarvey and Black-

ford, Sweet amended the claims to include the word "variable" with respect to the electrical signal values. The claims then read as they now read in the Sweet patent "applying variable electrical signal values representative of the desired deflections to the charging electrode whereby individual droplets are electrostatically charged . . . ." The claims were further amended to recite that the droplets which have different charges move through different trajectories.

69. As indicated in Finding of Fact # 11, above, none of Magarvey's publications taught a printing or recording use for his droplet deflection device. Sweet pointed this out to the patent office examiner. However, in doing so, Sweet made the following representation to the patent office "for clarification and to place the case in condition for immediate allowance":

> Obviously the Magarvey and Blackford publication does not teach the concept of a high speed jet recorder or printer in which droplets are first electrostatically charged in accordance with the instantaneous values of a varying signal and thereafter individually *deflected by varying amounts* dependent upon said signal by projecting the charged droplets through a fixed electrostatic field. Lastly, it does not in any way anticipate the concept just described as applied *to deposit the deflected droplets on a record medium to produce a pattern or design characteristic of the signal variations.*

70. Mr. Adelman, an expert witness called by Mead, testified in regard to the position taken by Sweet to gain allowance of his patent:

> A. Taking those remarks in the context of the specific amendment and viewing the Magarvey reference, it is my opinion that when the language is so read, one must conclude that in the Patent Office, Mr. Sweet was by virtue of the rejection limiting the scope of his claims to an oscillograph.

71. It is clear that through such characterizations of Magarvey and Blackford and through the amendments to the claims which Sweet made in response to the rejection of the claims as fully met by Magarvey and Blackford, Sweet limited his invention to oscillography in which a picture of the incoming waveform is reproduced on paper by recording as a function of time the magnitude of deflection of each droplet in a succession so that the succession of deflected droplets trace the waveform on paper. This is the function and operation of an oscillograph.

## F. *Lewis' and Brown's Work*

72. Maurine Hartley, of Brush Instruments, responded to one of Sweet's letters regarding commercialization of his oscillograph in late 1962. Hartley visited Sweet at Stanford. Upon his return to Brush, Hartley discussed Sweet's device with his assistant, Arling Dix Brown.

73. Within a very short time, Brown and his colleague Arthur M. Lewis began working on a drop writer. They subsequently undertook development work on a machine which would utilize Sweet's inventive concepts to print alphanumeric characters.

74. The original Lewis-Brown machine, which was first tested in July, 1963, utilized a "character generator" which included storage means for letters and numerals and a mechanism for generating distinctive voltage signals corresponding to the letters and numerals. A pre-determined sequence of characters and numerals (i. e., a message) was programmed on a disk and then the disk was scanned optically to convert the optical signals into electrical signals for printing the message stored on the disk. That character printer could be operated at 1200 to 2400 characters per second.

75. The character printer used in July, 1963, at Brush did not physically incorporate an interceptor or catcher for collecting unwanted or excess ink droplets. Instead, such droplets were simply deflected to a "dump line" which appeared as an underscoring of the printed message.

76. That same printer was demonstrated to A.B. Dick in February of 1964. During that demonstration, Lewis and his col-

leagues at Brush employed, for the first time, a collector to receive the unwanted ink drops.

## G. *The Lewis and Brown Patent Applications*

77. The first Lewis-Brown application was filed on September 25, 1964. That application, No. 399,291, included a description of the Lewis-Brown character printer, which included a nozzle and a means to vibrate the nozzle to produce a succession of uniformly-sized and uniformly-spaced ink droplets. Each droplet, as it was formed, was given an electrical charge characteristic of a predetermined character such that, when the varying-charge droplets were passed between a pair of constant-voltage deflection plates, the droplets were subjected to varying deflections to print the letter or numeral selected. (Lewis and Brown had recognized that the character generator could be a purely electronic device, as opposed to the electro-mechanical version they had tested in their laboratories. They accordingly described in their patent application such an all-electronic function generator.) Ink droplets not needed for printing were, as in the Sweet device, deflected to a catcher.

78. A second Lewis-Brown patent application was filed a few months later; it was Serial No. 425,162, filed January 13, 1965, and it contained essentially the same disclosure as the earlier one.

79. On July 12, 1965, Lewis and Brown filed the last of their applications, Serial No. 471,259. That application contained the same disclosure as the earlier applications, plus description in greater detail of the electronics for controlling the function generator.

80. The prosecution of the final Lewis-Brown application was very brief, the Patent Examiner having allowed on the first Office Action all of the claims as they were presented. Four prior-art references were cited, including an earlier publication by Sweet describing his invention and the use, in conjunction therewith, of a sine-wave generator.

81. The Lewis-Brown patent issued on January 10, 1967, and A. B. Dick became and is the exclusive licensee under it.

## H. *The Lewis-Brown Patent*

82. The Lewis-Brown patent discloses a device for printing predetermined characters by using a function generator to control the signals applied to the Sweet device. The only function generator disclosed produces an analog staircase waveform capable of deflecting ink droplets to many different locations to print an alphanumeric character. The patent refers to prior art Patent No. 2,958,828 as providing a suitable function generator.

83. The Lewis-Brown patent, like the Sweet oscillograph, only discloses deflections of the ink droplets which print in a direction transverse of the time axis of relative movement between the ink jet and the paper. It is disclosed that droplets are deflected to many locations transverse of the time axis, with seven different transverse printing locations being disclosed in the patent.

84. The Lewis-Brown patent defines "the word character or characters . . . to include . . . nonalphanumeric designs such as waveforms and various geometric configurations."

85. Claim 2 of the Lewis-Brown patent, the only claim alleged against Mead by A.B. Dick and Gould, requires signals representative of "predetermined characters" for charging the succession of droplets so that droplets are deflected in accordance with the signals to produce characters on a record from a single nozzle.

86. Without deflection, or with deflection longitudinal of the relative movement of the paper and a single nozzle, the Lewis and Brown device is incapable of producing more than one "character," being a straight-line waveform. In order to be capable of producing alphanumeric designs, geometric configurations, or common nonlinear waveforms, as required by claim 2, the Lewis and Brown device requires deflection *lateral* of the direction of the rela-

tive movement between the paper and a single nozzle, much like the Sweet patent.

87. The Lewis-Brown patent claims a method for generating a multiplicity of characters by use of a single nozzle.

### I. *The Interference Proceeding*

88. After the Lewis-Brown patent issued in January, 1967 (while Sweet's application was pending), Sweet copied claims from it, provoking an interference proceeding between Lewis-Brown and himself to determine the priority of invention. A lengthy interference proceeding ensued, but the Patent Office Board of Interferences found that Sweet did not disclose a function generator and hence could not claim it in combination with his drop-writing apparatus.

89. The Board of Interferences, in rendering the decision, adopted the position taken by Lewis and Brown relative to the scope of the Sweet application as follows:

Sweet's system records a cursive line representative of the voltage of an unknown, incoming waveform. A "picture" of the waveform appears on a moving strip of paper . . . It writes a continuous line, a cursive line, the length depending upon the length of the incoming signal.

### J. *Sweet and Cummings Work and Patent; Mead's Interest*

90. While Sweet and his supervisor Cumming were still working under the Signal Corps contract, they jointly conceived an ink-jet printer utilizing an array of jets arranged side by side in tandem.

91. The Sweet and Cumming device included two embodiments. The first, conceived on May 20, 1963, was for a facsimile recorder in which the input signal to the charging electrodes of the device would produce the desired image, such as a television video signal. That machine was not capable of printing predetermined characters, but could only print characters represented by the original signal fed to it.

92. A second embodiment of the Sweet and Cumming device was conceived later, on September 12, 1963. That machine included a character generator which enabled the Sweet-Cumming device to print predetermined characters.

93. Sweet and Cumming proposed that Stanford's laboratory undertake development of their idea. Stanford's laboratory director, however, rejected it.

94. Like the Sweet application filed earlier, the application covering the Sweet and Cumming device was filed by Honeywell, acting on behalf of Sweet and Cumming. The first Sweet-Cumming application was filed on March 25, 1964, as Serial No. 354–721; it was later supplanted by continuation-in-part application No. 660,163, filed August 1, 1967. As issued, the Sweet-Cumming patent (No. 3,373,437) disclosed both embodiments conceived by Sweet and Cumming in May and September of 1963, respectively. Neither of them was ever actually built by either Sweet and Cumming or by Stanford.

95. On the face of their patent, Sweet and Cumming acknowledged an indebtedness to Sweet's prior work stating:

"The present apparatus and method makes use of the invention disclosed in said copending application S.N. 354,659, particularly in that fluid droplets from a jet nozzle are electrostatically deflected in accordance with signal values by electrostatically charging the droplets in accordance with instantaneous signal values and then causing the charged droplets to be deflected by passing them through a substantially constant electrostatic field, the droplets being either deposited on a record medium or deflected to droplet intercepting means."

96. However, the ink jet devices of Sweet and of Sweet and Cumming achieve different results. In Sweet, one is attempting to replicate on paper the incoming waveform using a single jet; in Sweet and Cumming, the multiple jets in combination do not replicate on paper the incoming signal or waveform, but rather create visual information which is not characteristic of the waveform.

97. The Sweet and Sweet and Cumming devices also operate in a different way and utilize a different combination of parts. Where Sweet utilizes a single nozzle with deflection of the variously charged droplets laterally with respect to the relative movement of the paper and nozzle so as to replicate on paper the incoming waveform, Sweet and Cumming utilize two levels of charge and the cooperation of closely spaced jets to convey information. In Sweet and Cumming, uncharged drops which are used for printing pass through the deflection field undeflected to mark the paper, and the droplets which are charged are deflected to a catcher and prevented from reaching the paper. In Sweet and Cumming, deflection of those droplets to the catcher is longitudinal with respect to the relative movement of the paper and nozzle, and the catcher is parallel to the row of jets and extends across the pages.

98. The Sweet and Cumming printing system is not the equivalent of the Sweet oscillograph. Although the Sweet and Cumming printer uses some of the scientific principles involved in Sweet's oscillograph (which Sweet and Cumming described in their patent as Sweet's "invention"), Sweet himself stated:

> The concepts in our facsimile and printing ideas are not applicable to oscillographic recording systems. They do, however, involve ink jets with drop formation and electrostatic charging processes similar to those used in my oscillograph. The situation seems analagous to the case of microwave vacuum tubes which differ widely in configuration and application, but which have similar electron guns.

99. A. B. Dick and Mead now jointly own the Sweet-Cumming patent, A. B. Dick having purchased Sweet's interest and Mead having purchased Cumming's interest.

100. Mead began its development effort in ink jet printing, which culminated in the development of the DIJIT printer (the accused device), in earnest, in April, 1967, with the assistance of personnel of Battelle Memorial Institute in Columbus, Ohio.

101. Mead's efforts toward an ink jet printing system involved placement of a multitude of ink drops on a page to form a visually perceptible image of something other than a waveform. Mead envisioned an array of orifices across a page, or other printing surface, from which ink droplets would issue at high rates of speed as the page moved past the array. Selective interception of droplets which are not desired to mark the page to form the image would be effected by a switching operation in which each droplet not to be recorded would be electrically charged and deflected to an ink catcher.

102. Shortly after the issuance of the Sweet-Cumming patent in March, 1968, Mead began the negotiations which resulted in its purchase of Dr. Cumming's interest in that patent. Mead became interested in the Sweet-Cumming patent because it involved the concept under development by Mead wherein an array of orifices forming ink jets are utilized to print alpha-numerics and graphics by selectively intercepting droplets to form an image.

### K. *The Mead DIJIT Printer*

103. The Mead DIJIT printer utilizes a multiple array concept for printing in which the droplets used for printing issue simultaneously from a plurality of orifices. The droplets which print are essentially uncharged and undeflected in the Mead system. The DIJIT printer has a printhead disposed above and extended across the paper to be printed. This printhead includes an ink manifold and an orifice place which contains about 100–120 orifices per inch from which ink jets issue. A piezoelectric stimulating element is in physical contact with the orifice plate to vibrate the plate and to cause ink issuing from each jet to form a succession of uniformly sized and uniformly spaced ink droplets. Each orifice of the multiple array of orifices is thereby capable of producing ink drops at a rate of about 50,000 per second.

104. In the DIJIT printer, each droplet issuing from each orifice passes a charging electrode located in a charge tunnel posi-

tioned below the orifice plate. There an electric voltage charges each droplet to a standard charge value to effect interception unless a computer commands the absence of such voltage and grounds the charging electrode to avoid all but a minimal charge on the droplet. The droplets emerging from the charge tunnels then pass between a catcher and a deflection ribbon which are disposed below and on either side of the array of orifices. The catcher and deflection ribbon are maintained at a constant electrostatic potential. This arrangement of the catcher and deflection ribbon creates an electrostatic field. The droplets emerging from the orifices which have been charged to the standard charge value as they pass through the charge tunnel are deflected by the electrostatic field to the catcher, and thus do not mark the paper. The droplets which are not so charged to the standard value fall between the catcher and the deflection ribbon and mark the printing paper.

105. Each intercepted droplet in the DIJIT printer is deflected to a catch position in a substantially longitudinal direction with respect to the relative movement between the paper and the printhead. The DIJIT printer cannot operate if droplets deflect in a direction transverse of the relative movement between the paper and the printhead. The DIJIT printer provides no means for accomplishing such deflection.

106. In one sense, a single orifice on the Mead DIJIT is capable of producing one waveform. A single orifice operating without signal disturbance traces a line characteristic of the lack of disturbance. A line is a waveform. Moreover, a single orifice is capable of producing a linear waveform with periodic discontinuities. However, each orifice is incapable of producing a continuous waveform characteristic of a variable signal, and each orifice is incapable of producing common alphanumeric or geometric configurations.

107. The DIJIT printer achieves its desired function only through the combined results of the multiple orifices acting in cooperation with each other. Each single jet alone achieves no useful result. The DIJIT printer does not seek to trace on paper the incoming signal to a charge tunnel or tunnels; rather, the ink droplets, through the collective arrangement of the orifices and coordinated interception of droplets, create a composite picture unlike the incoming signals. The final picture is alphanumeric or graphic information which is not characteristic of the charging signals to the charging tunnels.

108. This concept of printing by directing a multitude of ink droplets toward a page, and selectively intercepting some of the droplets to form the image on the page, has been embodied in every commercialized Mead ink jet printing system.

## L. *The Events Leading up to this Litigation*

109. Ten days after the issuance of the Sweet patent on August 6, 1971, A.B. Dick notified Mead that application of the Sweet and Cumming array technology in connection with Mead's ink jet activities would infringe the Sweet patent.

110. Mead responded on August 17, 1971, stating that its plans for commercial activities in the "ink-jet printing area are not yet firm" but that, in any event, Mead did not believe activities based on the Sweet and Cumming array technology would infringe the Sweet patent.

111. Nothing more was heard from A. B. Dick about the Sweet patent until April, 1972, when A. B. Dick contacted Mead by telephone again asserting A. B. Dick's position that Mead could not practice the technology of Sweet and Cumming in its activities with respect to the Mead DIJIT ink jet printer without infringing the Sweet patent. By letter of May 5, 1972, Mead promptly replied to A. B. Dick setting forth in detail the noninfringement position of Mead, including a detailed discussion of the differences between the Sweet oscillographic apparatus and method and the binary, on-off operation of the Mead DIJIT system.

112. After May, 1972, between several extended delays, the parties periodically ex-

changed correspondence and met to discuss the same matter.

113. In September, 1973, the commercial Mead DIJIT printer won the IR 100 award of Industrial Research Magazine recognizing the 100 most significant commercial developments of the year.

114. In the same year, Mead began to sell printing service using a DIJIT system prototype.

115. Mead first offered a DIJIT printer for sale in 1975.

116. Mead's DIJIT system proved unprofitable through 1975 or 1976. By the middle of 1974, Mead had spent about six million dollars in research and development on DIJIT; the budget for 1974 was one million six hundred thousand dollars. The current budget generally runs to ten million dollars. Mead employs some 285 employees in the Dayton area in connection with the Mead's ink jet printing systems.

117. A. B. Dick commenced its suit against Mead on June 8, 1978. Between 1975 and 1978, Mead had contemplated but abandoned the idea of acquiring A. B. Dick. A. B. Dick's property interest in the Sweet, Lewis-Brown and Sweet-Cumming patents were considered by Mead when deciding whether to acquire A. B. Dick.

M. *Findings on Specific Issues*

1. *Laches*

118. A. B. Dick first became aware of the possibility that Mead might infringe on the Sweet patent approximately six years and ten months before it commenced infringement litigation. However, at the time of A. B. Dick's first awareness, the activities by Mead which A. B. Dick thought might infringe were "not yet firm."

119. A. B. Dick was apprised of Mead's position that DIJIT's development would not infringe on the Sweet patent, and an extensive articulation of Mead's reasons, therefor, approximately six years and one month before it commenced infringement litigation.

120. Mead's first commercial utilization of a prototype DIJIT system occurred approximately five years and six months before A. B. Dick commenced infringement litigation. Mead's utilization at this time was quite limited and unprofitable.

121. The prospect of profit by Mead in commercial utilization of the DIJIT system did not materialize until around 1975, approximately three years before A. B. Dick commenced infringement litigation.

122. Mead's contemplated acquisition of A. B. Dick after 1975 provides no reasonable excuse for A. B. Dick's failure to commence infringement litigation before 1978. However, given the initial uncertainty of Mead's plans in the ink-jet printing field, and given the uncertain commercial future of the DIJIT system during much of the time preceding 1978, it cannot be said that A. B. Dick's delay in filing suit, of as much as six years and ten months, was, under the circumstances, unreasonable.

2. *DIJIT's Infringement of Sweet*

123. Each orifice in the DIJIT printer, and, as a result, the DIJIT system as a whole, *literally infringe* claim 1 or claim 33 of the Sweet patent, *if* "lateral" deflection in claim 1 is interpreted to include deflection *longitudinal* of the relative movement between the record member and the nozzle, *or* if deflection in multiple "trajectories" to multiple "regions" in claim 33 is interpreted to include deflection in that same direction.

124. Each orifice in the DIJIT printer *does not literally infringe* claim 1 or claim 33 of the Sweet patent *if* said claims are interpreted to describe *only* deflection transverse of the time-axis of relative movement between the record member and nozzle, and thus define only oscillography.

125. If the DIJIT printer does not literally infringe claim 1 or claim 33 of the Sweet patent, as interpreted in the preceding paragraph, it does not infringe as an equivalent of the Sweet invention as claimed. Each orifice in the DIJIT printer, as well as the combined operation of the array of orifices in the DIJIT printhead, do not perform substantially the same function

in substantially the same manner to produce substantially the same result as claimed in the Sweet invention.

### 3. *DIJIT's Infringement of Lewis-Brown*

126. The DIJIT printer does not literally infringe claim 2 of the Lewis-Brown patent, or infringe same as an equivalent of the invention claimed, therein. No single orifice in the DIJIT printer produces multiple "characters" or is capable of producing multiple "characters" as the term is defined in the Lewis-Brown patent. Each orifice in the DIJIT printer, as well as the combined operation of the array of orifices in the DIJIT printhead, do not perform substantially the same function in substantially the same manner to produce substantially the same result as claimed in the Lewis-Brown invention.

### 4. *Matters Related to the Validity of the Sweet Patent*

127. The Sweet patent and neither of the applications, therefor, made disclosure regarding the specific properties of the ink to be used in Sweet's device, or regarding the use of a compensation network for drop placement error.

128. Sweet believed that the properties of the ink to be used were critical to the device's proper operation, but he also found that every ink which he had used, which could be passed through the nozzle, worked well.

129. There is no evidence that Sweet contemplated a specific ink or writing fluid with specific properties which would result in a best mode of operation at any time during the prosecution of his patent. Sweet's failure to disclose specific properties of ink critical to proper operation of the device does not constitute failure to disclose the best mode contemplated by him for practicing his invention.

130. Sweet testified that he had used a compensation network in connection with his "best system." Sweet did not state whether he thought that the compensation network was essential to the "best system."

On the contrary, because the compensation network only corrected drop placement when the signal voltage varied substantially in a short period of time, Sweet thought that the network "usually" was not necessary.

131. It is unclear whether the compensation network was contemplated by Sweet as a necessary part of the best mode for practicing his invention or whether, on the other hand, the network was thought an advantageous means for practicing his invention under limited circumstances but, cost and other factors considered, was not necessarily advantageous under ordinary circumstances. Sweet's failure to disclose the use of a compensation network in conjunction with the operation of his device does not constitute failure to disclose the best mode contemplated by him for practicing his invention.

132. Sweet did not disclose the use of a catcher for intercepting droplets, as an intensity control, in the first patent application, filed on July 31, 1963. Disclosure of a catcher in the practice of his invention was made in the second patent application, filed on March 25, 1964, and was included in the patent as issued.

133. Sweet contemplated the use of a catcher "very early" in the development of his invention and had conducted experiments using a catcher prior to his first patent application. However, Sweet testified that at the time the first patent application was filed, the catcher "was still very experimental in that I had just completed it and had really had no chance to assess its practicality or its reliability." At the time of the first application, Sweet was not certain that the catcher was a necessary part of the best mode of practicing his invention "in light of its complexity." Sweet's failure to disclose the use of the catcher in the operation of his device in his first patent application, filed on July 31, 1963, does not constitute a failure to disclose the best mode contemplated by Sweet for practicing his invention at that time.

134. Because Sweet did not fail to disclose the best mode contemplated by him for practicing his invention in the first patent application filed on July 31, 1963, Sweet's patent is entitled to an effective filing date of July 31, 1963.

135. Because the effective filing date of the Sweet patent is July 31, 1963, potential public uses (e. g., during the August, 1962, TAC and Contractor meetings), potential placements on sale (e. g., by Sweet's letters after August, 1962), potential descriptions in printed publications (e. g., CQSRs 32 and 33, distributed some time prior to March, 1963), and other activities with respect to Sweet's invention after July 31, 1962, are not significant.

136. CQSR 31 contained an unclassified description of Sweet's invention. CQSR 31 was distributed, as a confidential document prior to July 31, 1962, to a select number of persons and organizations interested in the field of ink jet printing and related technologies.

137. Although the description of Sweet's invention in CQSR 31 was unclassified, it is not clear that its distribution to selected persons and organizations under confidential cover rendered the descriptions accessible to a substantial portion of the class of persons skilled or interested in the art of ink jet printing. CQSR 31 was not a printed publication. CQSR 31 does not constitute a description more than one year prior to the effective application date.

138. Sweet did not disclose Waage's work to the patent office during the prosecution of his patent applications. Although Sweet thought that Waage was the "closest prior art," at least by 1970, he thought this was so only in relation to the art of drop generation for purposes other than writing or recording.

139. Waage did not teach a recording use for his device. Moreover, Waage did not teach variable deflection of selectively charged droplets in a constant or uniform deflection field. To the extent that Waage did disclose deflection for purposes of observing the physics of drop movement, Waage was more remote, or cumulative to other prior art references ultimately known to the patent office prior to the issuance of the Sweet patent, such as Magarvey's studies.

140. Sweet's failure to disclose Waage's work to the patent office during the prosecution of his patent applications did not violate the duty of candor to the patent office.

141. None of Mead's prior art references disclose a device for permanently recording variable electronic signals by constant field deflection of selectively charged discrete ink droplets projected toward a recording medium. A device such as this was not known in the art prior to Sweet's work.

142. The fact that the basic elements of such device had been known in the art for at least 30 years prior to Sweet's work (i. e., Rayleigh's study of drop formation phenomenon in conjunction with Schroter's disclosure of a variably charged ink jet for recording purposes), but that the device had not been reduced to practice until Sweet's work, is indicative that such a device was not obvious to a person of ordinary skill in the art prior to Sweet's work. Magarvey's repeated disclosures of a discrete droplet charge system beginning more than five years before Sweet's work, and the absence of a recording purpose for same until Sweet's work, lends support to this conclusion.

143. Sweet's patent claims invention of means for practicing one of the number of devices for the purpose of oscillographic recording. As such, the claimed invention was not known in the art prior to Sweet's work, and would not have been obvious to a person of ordinary skill in the art prior to that time.

5. *Matters Relating to the Validity of the Lewis-Brown Patent*

144. Sweet's use of a sine-wave generator in conjunction with the practice of his invention was disclosed to the patent office in the course of Lewis' and Brown's prosecution of their patent applications. Lewis and Brown did not violate the duty of candor to the patent office in this respect.

145. The Lewis-Brown patent defines "character" or "characters" to include waveforms. This definition, in conjunction with claim 2 of the Lewis-Brown patent, defines Sweet's prior work using a sine-wave generator in conjunction with his oscillographic recorder, with the exception of possible minor improvement in the type of transducer applied to stimulate drop formation. Lewis and Brown did not invent the use of Sweet's device in conjunction with a sine-wave generator.

146. Sweet did not use a catcher to effect discontinuous drop placement, and did not practice his invention to produce discontinuous characters as otherwise defined in the Lewis-Brown patent (i. e., alphanumerics and geometric configurations). The art prior to Lewis and Brown discloses no device employing Sweet's invention in conjunction with an alphanumeric or geometric character generator to produce alphanumeric or geometric characters.

147. However, the use of character generators other than sine-wave generators, in connection with ink drop printing, was known in the art prior to Lewis' and Brown's work. For example, the Winston patent, which was employed commercially as the Teletype Inktronic, discloses the application of a "control device" to "character-delineating electrodes" in order to produce a "predetermined pattern." Moreover, the Lewis-Brown patent in itself states:

> The technique of providing sets of digital pulses which are characteristic of predetermined characters is well-known to those familiar with the art, and therefore need not be described in detail.

148. That the use of character generators other than sine-wave generators in connection with ink drop printing was known in the art prior to Lewis' and Brown's work; that Sweet had used a sine-wave generator, which is a kind of character generator, in conjunction with his invention; and that Lewis and Brown reduced to practice the use of a character generator, other than a sine-wave generator in connection with Sweet's invention within the year after learning of Sweet's work, are all indica-

tive that the use of a character generator, other than a sine-wave generator in connection with Sweet's invention, would have been obvious to a person of ordinary skill in the art at the time of Lewis' and Brown's work.

## IV.

### Conclusions of Law

#### A.  *Laches*

149. A defendant in an infringement suit who asserts the defense of laches has the burden of proving an unreasonable delay by the plaintiff in filing suit after the first notice of infringement. However, the defendant is aided in carrying this burden by a presumption which is derived from the statutory period of recoverable damages found in 35 U.S.C. § 286. The presumption holds that a delay in filing suit longer than six years after the notice of infringement is unreasonable and prejudicial. Under such circumstances, the plaintiff will be barred by laches unless he can: (1) rebut the presumption of unreasonableness in the delay by showing a good excuse, therefor; (2) rebut the presumption of prejudice; or (3) show such egregious conduct on the defendants' part that the equities otherwise weigh in plaintiffs' favor. *TWM Mfg. Co. v. Dura Corp.*, 592 F.2d 346, 348–49 (6th Cir. 1979).

150. As indicated above (para. 122), the Court is satisfied that Mead's own initially uncertain plans in development of the DIJIT printer, and the commercial uncertainty of DIJIT for an extended period thereafter, are sufficient findings upon which to base a conclusion that A. B. Dick's delay in filing suit, in excess of six years, was not unreasonable as a matter of fact under the circumstances. A. B. Dick is, therefore, not precluded from prosecuting this infringement action by reason of laches.

#### B.  *The Infringement Issues*

151.

In determining whether an accused device or composition infringes a valid pat-

ent, resort must be had in the first instance to the words of the claim. If accused matter falls *clearly* within the claim, infringement is made out and that is the end of it.

*Graver Tank & Mfg. Co. v. Linde Air Products*, 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950) (emphasis added).

152. However, where the claims in a patent are ambiguous, the claims "must be read in the light of the invention disclosed and cannot be given a construction broader than the teachings of the patent as shown by the drawings and specification." *FMC Corp. v. F. E. Myers & Bros. Co.*, 384 F.2d 4, 13 (6th Cir. 1967); *United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966); *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 217, 61 S.Ct. 235, 238, 85 L.Ed. 132 (1940). Since the Sweet patent discloses only oscillographic recording, the scope of its claims is limited to oscillographic recording. The Lewis and Brown patent claims are limited in scope to the only operation disclosed which requires printing of characters with charged droplets that are deflected transverse to the relative movement between the paper and nozzle.

153. Based on representations made to the Patent Office and amendments made to the claims in order to obtain the patent, A. B. Dick is estopped to construe the claims of the Sweet patent to claim other than an oscillographic recorder. *Kaiser Industries Corp. v. McLouth Steel Corp.*, 400 F.2d 36 (6th Cir. 1968), *cert. denied*, 393 U.S. 1119, 89 S.Ct. 992, 22 L.Ed.2d 124 (1969). A "patent must be judged by what is claimed for it in the patent application— not by what is asserted in subsequent litigation." *Philips Industries v. State Stove & Mfg. Co.*, 522 F.2d 1137, 1140 (6th Cir. 1975), citing *Ohio Citizens Trust Co. v. Lear Jet Corp.*, 403 F.2d 956, 958 (10th Cir. 1968), *cert. denied*, 394 U.S. 960, 89 S.Ct. 1308, 22 L.Ed.2d 561 (1969).

154. The DIJIT printer does not literally infringe on claims 1 or 33 of the Sweet patent or on claim 2 of the Lewis-Brown patent, as said claims are properly interpreted.

155. An accused device may be found to infringe on a patent, if not literally, as an equivalent of the claimed invention if the accused device "performs substantially the same function in substantially the same way to obtain the same result." *Graver, supra*, at 608, 70 S.Ct. at 856.

156. Mead's DIJIT printer does not infringe the Sweet patent because the DIJIT printer performs a function substantially different from that of the Sweet recording oscillograph and operates in a substantially different way to accomplish a substantially different result. Mead's DIJIT printer does not infringe the Lewis and Brown patent because the DIJIT printer performs a function substantially different from that of the character printer disclosed in the Lewis and Brown patent and operates in a substantially different way to accomplish a substantially different result. *Dunlop Co. v. Kelsey-Hayes Co.*, 484 F.2d 407 (6th Cir. 1973), *cert. denied*, 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1975); *Nickerson v. Bearfoot Sole Co.*, 311 F.2d 858 (6th Cir. 1962), *cert. denied*, 375 U.S. 815, 84 S.Ct. 48, 11 L.Ed.2d 279 (1963).

### C.  *The Validity of the Sweet Patent*

157. The Sweet patent is not invalid for failure to disclose the best mode contemplated by Sweet for practicing his invention, under 35 U.S.C. § 112, by reason of Sweet's failure to disclose the properties of ink to be used in operation of his device, or the use of a compensation network in connection with the operation of his device.

158. July 31, 1963, is the effective filing date of Sweet's application for his patent, and said filing is not rendered ineffective for failure to disclose the best mode contemplated by Sweet for practicing his invention at that time, under 35 U.S.C. §§ 112, 120; by reason of Sweet's failure to disclose the use of a catcher in the operation of his device; the properties of ink to be used in the operation of his device; or the use of a compensation network in connection with the operation of his device.

159. The Sweet patent is not invalid, under 35 U.S.C. § 102(b), by reason of any activity in connection with Sweet's work within the year preceding July 31, 1963.

160. Because CQSR 31 is not a printed publication within the meaning of 35 U.S.C. § 102(b), the Sweet patent is not invalid under 35 U.S.C. § 102(b) by reason of the distribution of CQSR 31, containing a description of Sweet's invention, prior to July 31, 1962.

161. The Sweet patent is not invalid for violation of the duty of candor to the patent office, by reason of Sweet's failure to disclose the Waage reference to the patent office during the prosecution of his patent applications.

162. The Sweet patent is not invalid under 35 U.S.C. § 103 because the differences between the subject matter patented by Sweet and the prior art are such that subject matter taken as a whole would not have been obvious to a person having ordinary skill in the art at the time of Sweet's invention.

D. *The Validity of the Lewis-Brown Patent*

163. The Lewis-Brown patent is not invalid for violation of the duty of candor to the patent office, since Lewis and Brown did disclose Sweet's work with a sine-wave generator to the patent office during the prosecution of their patent applications.

164. A patent carries a statutory presumption of validity. 35 U.S.C. § 282. The presumption of validity gives the grant substance and value but is not conclusive. *Westinghouse Electric Corp. v. Formica Insulation Co.*, 266 U.S. 342, 348, 45 S.Ct. 117, 119, 69 L.Ed. 316 (1924). The presumption has no independent evidentiary value in infringement litigation but only serves to place the burden of proof on the party who asserts invalidity as a defense to infringement. *Reynolds Metals Co. v. Acorn Building Components, Inc.*, 548 F.2d 155, 160 (6th Cir. 1977).

165. The Lewis-Brown patent is invalid under 35 U.S.C. § 102(f), to the extent it claims invention of the use of a sine-wave generator in connection with the operation of Sweet's invention because Sweet, and not Lewis and Brown, invented the subject matter so described.

166. The Lewis-Brown patent is invalid under 35 U.S.C. § 103 because the differences between the subject matter sought to be patented by Lewis and Brown and the prior art are such that the subject matter taken as a whole would have been obvious to a person of ordinary skill in the art at the time Lewis' and Brown's invention was made.

WHEREFORE, based upon the foregoing, it is the opinion of this Court that:

(1) Plaintiffs are not precluded from prosecuting this infringement action by reason of laches;

(2) Mead's DIJIT printer does not infringe, literally or as an equivalent, on claims 1 and 33 of the Sweet patent or on claim 2 of the Lewis-Brown patent;

(3) The Sweet patent is valid; and

(4) The Lewis-Brown patent is invalid.

The Defendant Mead is to prepare a Judgment Entry, in accordance with the above opinion, and submit same to this Court for filing within twenty-one (21) days from date of receipt of this opinion.