UNIVERSAL ELECTRIC CO.,
Plaintiff-Appellant,

v.

A. O. SMITH CORPORATION,
Defendant-Appellee.

No. 79–1342.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 12, 1980.

Decided March 9, 1981.

Rehearing Denied April 15, 1981.

Basil C. Foussianes, William H. Francis, Barnes, Kisselle, Raisch & Choate, Detroit, Mich., for plaintiff-appellant.

Glenn O. Starke, Merl E. Sceales, Andrus, Sceales, Starke & Sawall, Milwaukee, Wis., Robert Boynton, Birmingham, Mich., for defendant-appellee.

Before LIVELY and MARTIN, Circuit Judges, and CECIL, Senior Circuit Judge.

LIVELY, Circuit Judge.

Universal Electric Company (Universal) appeals from a judgment of the district court holding its patents 3,567,973 (973) and 3,732,616 (616) invalid. Patent 973 is a product patent and 616 is a method patent which sets forth the process by which the device in 973 is manufactured and assembled. The abstracts and specifications are identical in the two patents and the claims of 616 track some of those in 973, with added words to indicate that it is a method patent. Patent 973 was issued on March 2, 1971, and 616 was issued on May 15, 1973 as a division of 973. This action was filed by Universal on October 19, 1973, claiming infringement of both patents by A. O. Smith Corporation (Smith) and seeking an injunction, an accounting, triple damages and attorneys fees and costs. In its answer and counterclaim Smith denied infringement and sought a declaratory judgment that both of the patents in suit are invalid. The district court held both patents invalid for obviousness and held that 616 also lacks novelty. We agree with the conclusion that both are invalid for obviousness and affirm without considering the further findings of the district court with respect to infringement.

## THE PATENTED DEVICE

The concern of the inventors who obtained the 973 patent was to design a sheet metal casing or housing for small electric motors which would hold the components of the motor in their proper positions without the use of bolts. The inventors stated their purpose in the specification as follows:

This invention relates to electric motors and more particularly to the construction of the frame or housing of an electric motor.

In the construction of electric motors it is customary to provide a cylindrical steel sheel which encloses the stator and also to provide substantially flat circular end members or closures which support the

bearings of the motor and hold them in concentric relationship to the stator. It is customary to provide such end members with a precision machined male rabbet which nests into a female rabbet machined into the cylindrical shell, thus providing the necessary precision location of the bearing. Close tolerance is necessary to center the rotor into stator and to hold the end closures perpendicular to the shell. The end members are held in position on the shell by bolts which extend through both end members and the full length of the cylindrical shell.

The cylindrical shells are made by rolling a flat piece of sheet metal and welding the resulting seam together. Because of the nature of the process, it is impossible to assure that the ends of the cylinder so formed will be perpendicular to the cylindrical axis. In fact, the sheet metal may deviate as much as one sixty-fourth of an inch from a single plane thus forming a mismatch at the circumferential meeting of the ends of the sheet metal. This resulting mismatch and nonperpendicularity can only be corrected by a costly machining operation.

There are several disadvantages to using bolts to hold the end members in place. First, because motors vary in length and because it is necessary to offer a large variety of bolt lengths for the motor for mounting purposes, an extremely large inventory of bolts must be maintained. Second, a hole must be provided in the stator for the bolt to pass through the stator. This creates an area of high reluctance to the passage of magnetic flux. This hole is also very difficult to keep free of integral insulation and varnish. Third, the bolt must be adequately insulated from the motor winding. This is done by either insulating the bolt, the winding, or by forming the winding such that there is an adequate air-gap clearance to the bolt.

Among the objects of the invention are to provide a low cost accurate means of locating and aligning the end members of an electrical motor and to secure such members to the shell of the motor in a novel manner; to provide securing means such that the process can be reversed to provide for disassembly of the motor for repairs; to have the end members secured such that there can be no relative movement to the motor shell; to provide a securing means for the end members which does not require holes, slots, or notches in the stator and does not require a special forming or insulating of either the winding or the securing means; to provide a securing means for the end members which will not require openings through either the end member or the shell which will remain open after the motor is assembled; to provide registering surfaces on the end members and shell which are not subject to distortion under impact loads.

Stated more simply, the entire purpose of 973 was to incorporate into the assembly of small electrical motors a fastening method for enclosing the ends of the cylindrical shell of the motor in a manner to prevent movement of the ends (and of components serviced by the ends), either by rotation or by displacement inward or outward. This had been accomplished previously by running "through bolts" from one end to the other. In addition to requiring a large inventory of bolts of different lengths, this method required the installation of "shimming" washers of different thicknesses in the assembly of each motor. What was sought was a way to mass produce the small motors typically used in fans and air conditioners while maintaining the efficiency and quiet operation which characterized electrical motors whose parts were secured by through bolts.

Patent 973 achieves this result by cutting notches at intervals around the end of the cylindrical housing and machining matching projections in the circular end pieces which enclose the motor. ("Circumferentially spaced" in the patent). When the end pieces are inserted into the cylinder, on a perpendicular plane to the axis of the cylin-

der, the matching notches and projections prevent displacement inward and rotation of the end pieces. Displacement outward is prevented by a series of slots spaced at intervals around the end of the cylinder. When the end pieces are in place, the loops created by the slots are crimped or deformed downward, toward the inside of the cylinder, clamping the end pieces in place.

The diagrams in attached plaintiff's exhibit 223 illustrate the operations described above. Fig. 1 shows an assembled motor, viewed from the side, with a partial cutaway to show the assembly. The cylindrical shell (16) encloses a stator (12) which is fixed and a rotor (13) on a shaft (14) which is supported by bearings (15). Fig. 2 is an end view of a motor with the circular end enclosure in place. Fig. 4 illustrates how the projections of the end pieces (22) fit into the notches (20) at the end of the cylindrical shell. Fig. 5 shows a slot in the shell (21) and the loop (23) created by the segment of the cylindrical shell which lies between the slot and the end of the shell. Fig. 6 shows how the end piece is secured against outward displacement by bending the segment inward (toward the center of the shell) and against the outer surface of the end piece.

The specification of patent 973 requires the notches and slots to be accurately pierced in the cylindrical shell so that the distances between the base of the notches at opposite ends and the distances between the slots at opposite ends of the shell "are accurate longitudinally of the shell." When the end pieces are accurately positioned "circumferentially and axially with respect to the shells" the bearings which are supported by the end pieces will also be accurately positioned so that the longitudinal axis of the rotor will "coincide with the longitudinal axis of the shell." In other words, the rotor and shaft will lie squarely in the longitudinal axis of the cylindrical housing. To achieve this result the end pieces must be secured in a position which is perpendicular to the cylindrical shell.

It was stipulated that claims 1, 2, 3, 12, 13 and 17 through 24 of patent 973 were claimed to be infringed. Claims 1–3, 12 and 13 describe "an electric motor" combining the features described above and claims 17 through 24 describe "a dynamo-electric machine" incorporating the same basic features. The purpose of each embodiment of the claimed invention is the same and this purpose is achieved basically in the same manner in each. All claims refer to a means of securing the "end members" or "end frames" of an electric motor housing in such a manner as to prevent their rotation or displacement. The accused device of Smith incorporates notches and projections, together with slot-loops, to accomplish the same result as shown in attached exhibit 1, which pictures an assembled A. O. Smith motor.

NO. 79-1342          Plaintiff's Exhibit 223

PATENTED MAR 2 1971          3,567,973

SHEET 1 OF 3

Plaintiff's.
Deposition
Exh. No. 1

NO. 79-1342

For our purposes the only significant difference between the motor housings is that Smith uses self-aligning bearings, which require less accuracy in fabrication than those used by Universal.

## THE PRIOR ART

The patent examiner cited three prior art references. All related to electric motors. In support of its claim of invalidity, Smith cited a number of patents relating both to electric motors and to other mechanisms where cylinder ends were held in place by notches and projections, slot-loop arrangements or both. Universal contends prior art unrelated to electric motors is neither analogous nor relevant to the patent in suit. Universal's expert witness, Paul F. Youngdahl, testified that one versed in the art would not look to non-electric motor art and if he did so, would find nothing to suggest or teach the invention of the 973 patent.

The district court found that both 973 and 616 would have been obvious to one skilled in the art at the time Universal's patent was sought, in light of the prior art. In reaching this conclusion the district court considered several prior art devices to have been of particular significance. Among these were German patent 1,090,744, related to electric motor construction, an electric motor by Fasco, admitted to be prior art, and Strozinski patent 2,673,467 for engine starter gearing. The district court found, "The primary function of the projection-notch arrangement, as shown in the prior art [the three references listed above plus others treated less exhaustively by the district court] is to provide a surface against which the end member can bear to prevent longitudinal displacement of the end member, and secondly, to restrict rotational movement of the end member. This is the same function performed by the notch-projection arrangement of the '973 patent."

The district court then found that slot-loop connections are a conventional means of securing housing members together as exemplified in a number of prior art references. This finding was based primarily upon consideration of the Ayres patent 2,972,983 for a brake booster device, the Lucas switch, admitted by Universal to be prior art, and the Price patent 3,146,682 (casing for a fluid booster motor). After reviewing the prior art references which we have cited, along with others, the district court stated its finding that "[t]he slot-loop and slit-loop connections, as shown in the prior art, function in the same manner as the slot-loop connection of the '973 patent to prevent the two connected members from moving apart." The court also noted that the Price patent 3,146,682 illustrates the use of a projection-notch arrangement and a slot-loop or slit-loop connection in combination.

The district court then summarized its findings and conclusions with respect to Universal patent 973 as follows:

The claims of the '973 patent merely combine a projection-notch arrangement of the prior art with a slot-loop connection of the prior art. The projection-notch arrangement is used for the identical purpose used in the prior art, i. e., to prevent inward displacement of the end frame within the shell and to prevent rotation of the end frame. The slot-loop arrangement in the prior art performs the same function as it does in the '973 patent, i. e., connects the end member to the shell and prevents outward displacement of the end member.

Further, the prior art shows that these two arrangements have been combined in a casing construction. Carrying this teaching of the prior art over to an electric motor casing and attaching two end members to a shell in place of one, would be obvious to a person skilled in the mechanical arts.

The district court similarly found the method patent 616 invalid for obviousness whether interpreted as Universal claimed it should have been, or as the court found the language of claim 1 to require. The Fasco motor was cited specifically as pertinent prior art.

## VALIDITY

Every United States patent begins life with a presumption of validity, 35 U.S.C. § 282,[1] and this is the proper place for our analysis to begin. *American Seating Co. v. National Seating Co.*, 586 F.2d 611, 615 (6th Cir. 1978), *cert. denied*, 441 U.S. 907, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979). As we pointed out in *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 713 (6th Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 303 (1975), this presumption merely places the burden of proof of invalidity and has no independent evidentiary value. It is firmly established that the presumption is weakened greatly where the Patent Office has failed to consider pertinent prior art. *Reynolds Metals Co. v. Acorn Bldg. Components, Inc.*, 548 F.2d 155, 160 (6th Cir. 1977); *Bolkcom v. Carborundum Company*, 523 F.2d 492, 498 (6th Cir. 1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976); *Dunlop Company, Ltd. v. Kelsey-Hayes Co.*, 484 F.2d 407, 413 (6th Cir. 1973), *cert. denied*, 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1974); *Monroe Auto Equipment Co. v. Heckethorn Mfg. & Supply Co.*, 332 F.2d 406, 413 (6th Cir.), *cert. denied*, 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964). In the present case the district court found "None of the prior art relied on by the defendant was considered by the Patent Office.... The art considered by the Patent Office is less pertinent than the prior art relied on in this litigation, since as pointed out by defendant's witness Gordon, none of the three patents considered [by the Patent Office] show the notch projection

1. "A patent shall be presumed valid.... The burden of establishing invalidity of a patent or any claim thereof shall rest on a party asserting it."

feature of the '973 patent or the slot-loop type of connection."

Universal maintains that the district court erred in its determination of what constitutes pertinent prior art in this case. It argued in the district court, and contends here, that only electric motors should be considered pertinent prior art. The district court noted the testimony of Universal's witness Youngdahl to this effect, but appears to have accepted the contrary testimony of Smith's expert witness William T. Gordon. This witness testified that one schooled in the art would look beyond electric motors to the housing of other motors, switches and similar devices as analogous art. It seems clear that knowledge of metal fabrication is involved in Universal patents 973 and 616 and that fabrication and construction of cylindrical metal structures which house various mechanisms other than electric motors is relevant. In *Skega Aktiebolag v. B. F. Goodrich Co.*, 420 F.2d 1358, 1359 (6th Cir.), *cert. denied*, 400 U.S. 825, 91 S.Ct. 49, 27 L.Ed.2d 54 (1970), this court defined the test for analogous prior art as "similarity of elements, problems and purposes." Applying this test to the prior art considered by the district court leads to agreement that such prior art is analogous and pertinent. Each of the earlier patents and mechanisms considered by the district court employed notch-projection or slot-loop arrangements, or a combination of both, to eliminate the problem of displacement of the end pieces of a cylindrical metal housing. In each case, proper positioning of the end pieces was accomplished by means of male-female connections or crimped loops, or both. Proof of the existence of this prior art, unexamined by the Patent office, greatly weakened the presumption of validity.

■ Universal further asserts that the district court erred in failing to comply with the procedures for determining obviousness as established by the Supreme Court in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). *Graham* was the first decision in which the Supreme Court discussed 35 U.S.C. § 103,[2] a portion of the Patent Act of 1952 which made non-obviousness a statutory requirement of patentability. It was emphasized by the Court that § 103 did not add a "new dimension" of patentability but was a codification of judicial precedents which derived from the constitutional standard of patentability. *Id.* at 3–4, 17, 86 S.Ct. at 686, 693. The Court then defined several factual inquiries which must be conducted by a court requested to decide a claim of obviousness. "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." *Id.* at 17, 86 S.Ct. at 693. In light of these three factual determinations the court must then decide as a matter of law whether or not the subject matter of the patent in issue is obvious.

We believe the district court followed the *Graham* directive in the present case. The scope and content of prior art was determined to be cylindrical metal housings where displacement of the end members must be prevented, and where this problem has been solved by the use of notch-projection arrangements or slot-loop connections, or combinations of both. The district court specifically found that there were no significant differences between the prior art and the claims at issue. Finally, the district court determined the level of skill in the pertinent art. The district court did not attempt to define this level of skill precisely. However, implicit in the acceptance of the testimony of the witness Gordon

---

2. A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

is a finding that the level of skill is that of a person familiar with the requirements for accurately enclosing cylindrical shells or housings and familiar with metal fabrication. To such a person the solution to the end member displacement problem would obviously be found in such conventional and well known arrangements as male-female connections and crimped or mashed loops. Contrary to the claim of Universal, we conclude that the district court did follow *Graham* in analyzing Smith's § 103 defense.

■ Since the three inquiries outlined in *Graham* are factual, the findings of the district court on the stated issues are subject to the clearly erroneous rule, Fed.R. Civ.P. 52(a), and may not be set aside if they are supported by the record. *Reynolds Metals Co. v. Acorn Bldg. Components, Inc.,* supra, 548 F.2d at 161; *Philips Industries, Inc. v. State Stove & Mfg. Co.,* 522 F.2d 1137, 1139 (6th Cir. 1975); *Westwood Chemical, Inc. v. Owens-Corning Fiberglass Corp.,* 445 F.2d 911, 917 (6th Cir. 1971), *cert. denied,* 405 U.S. 917, 92 S.Ct. 941, 30 L.Ed.2d 786 (1972). Universal maintains that the findings of the district court are clearly erroneous, particularly the finding that there are no significant differences between the prior art and the claims at issue. It argues that the district court failed to consider and determine what is the claimed subject matter of the patents "as a whole" and the differences between that subject matter and the prior art. This resulted, according to Universal, from the district court's failure to note the differences between various claims in the two patents and to consider each claim separately. Some of the claims of the patents refer only to notches and slots in "an end" of the cylinder, while others call for notches at both ends and "accurate longitudinal spacing between the notches at opposite ends."

Universal maintains that the language quoted immediately above added a new element—longitudinally accurate spacing at opposite ends—which appears in none of the prior art. This characteristic of longitudinally accurate spacing of notches assures that the end pieces will be perpendicular to the axis of the cylinder when they are in place. It appears merely to mean that the recessed edge or the "back" of each notch will be the same distance from the end of the cylinder. Unless each notch around the circumference of the cylinder is cut to the same depth, together the notches will not create a single plane for the end plate to abut against. When the notches are all cut to the same depth the end plate will be resting against the backs of the notches in a position perpendicular to the axis of the cylinder. When this condition exists at opposite ends of the cylinder, both end plates will be perpendicular to the axis of the cylinder and parallel to each other. Universal's engineer Raymond Bizoe stated in his deposition that the problem to be solved in constructing sleeve-bearing type motors without bolts was "mismatch and non-perpendicularity." This condition was described as occurring when the two end plates of a motor are not perpendicular to the center line.

Universal argues in this court that the requirement of longitudinally accurately positioned notches produces "a precise longitudinal location between the rotor and the stator." We have carefully examined claims 2, 3, 12 and 13 of patent 973 and claim 6 of patent 616 upon which Universal rests this argument. We find nothing in any of the claims to indicate that the function of "circumferentially spaced notches" or of notches "accurately positioned longitudinally of the shell" is to produce a precise longitudinal location between the rotor and the stator. Rather, this language, in common with other language used in the specifications and the claims, describes the function of preventing displacement of the end plates. This was the purpose of the notch-projection and slot-loop arrangement in the prior art, and we can discern no new element or new function in 973 and 616.

■ If Universal in contending by this argument that these features of its inven-

tion produced an unexpected or "synergistic" result or effect[3]—"a precise longitudinal location between the rotor and the stator"—it is enough to note that no such result was described in the specification or any of the claims. We have held that a claim of synergistic effect should be mentioned in the patent application and not put forward for the first time when validity of the patent is being tested in court. *American Seating Co. v. National Seating Co.*, supra, 586 F.2d at 621; cf., *Philips Industries, Inc. v. State Stove & Mfg. Co., Inc.*, supra, 522 F.2d at 1141. More to the point, however, is the fact that this result could not be considered synergistic in any sense. The purpose of properly positioned and secured end plates is to hold the component parts of the assembled motor in place, thus in proper relationship to each other, without the use of bolts. This was the very purpose of the introduction of accurately machined cylinder ends and end plates.

With respect to Universal's contention that the claims requiring accurate longitudinal spacing of notches at opposite ends of the cylinder should be considered separately from those which refer only to one end, Smith points out that references to accurate longitudinal spacing were made in 973 claims referring to embodiments requiring end plates at only one end of the cylinder as well as to those with such plates at both ends. The district court specifically found that the use of a pair of end plates, one at each end of the cylindrical housing, is not "a necessary and critical part of plaintiff's invention." Upon consideration of all the claims in suit we conclude that this finding is not clearly erroneous. The arguments based on the requirement of longitudinal accuracy do not lead to the conclusion that the district court erred in its determination of obviousness.

Universal also argues that "secondary considerations," particularly the failure of others to meet a long-felt need and the commercial success of its invention, demonstrate that it was not an obvious development. Such considerations were described as "subtests" in *Graham*. 383 U.S. at 36, 86 S.Ct. at 703. These considerations may tip the scales in a close case, but otherwise are not a proper basis for a finding of patentability. *Westwood Chemical, Inc. v. Owens-Corning Fiberglass Corp.*, supra, 445 F.2d at 918; *Tapco Products Co. v. Van Mark Products Corp.*, 446 F.2d 420, 425 (6th Cir.), cert. denied, 404 U.S. 986, 92 S.Ct. 451, 30 L.Ed.2d 370 (1971). Furthermore, as the district court found, Universal did not "scoop the industry" by coming up with an answer to a long-felt need. To the contrary, three manufacturers independently solved the same problem at about the same time, all employing similar techniques.

■ We have concentrated on patent 973 and have written very little about 616 in this opinion. There are two reasons. First, if the concept of accurately enclosing the cylindrical housing of electric motors by means of notch-projection and slot-loop arrangements is obvious, the method described in 616 is equally so. The specifications of the two patents are identical and the claims of 616 use much of the language of 973 with the addition of "method" words such as "forming." In the second place, most of the evidence concerning 616 was directed to the issue of infringement. It was uncontradicted that Smith cut the notches and slots in flat lengths of sheet metal before they were shaped into cylin-

---

3. *In Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.*, 562 F.2d 365, 370 (6th Cir. 1977), we described synergism as follows:

The synergistic test is met when a combination of elements produces an effect which is "greater than the sum of the several effects taken separately." *Anderson's-Black Rock*, supra, 396 U.S. [57] at 61, 90 S.Ct. [305] at 308 [24 L.Ed.2d 258]. There must be an "impalpable something" in the combination itself which consists of previously known elements to pass the requirement of nonobviousness. *Philips Industries*, supra, 522 F.2d at 1141. Stated another way, there must be some "unusual or surprising result" from a combination of old elements. *Dickstein*, supra, 522 F.2d [1294] at 1299 (6th Cir. 1975).

ders and welded. On the other hand, Universal cut the notches and slots after the housings were formed. Though Universal argued that the sequence of events is unimportant and is not prescribed by the language of the 616 patent, the district court found that this sequence was an essential element of the 616 patent. This finding was fully supported by the record. One of the inventors testified that it was important to "notch it and pierce it" after the cylinder was formed to overcome "mismatch and non-perpendicularity." He described this sequence of steps as "absolutely necessary."

■ We conclude that the district court properly determined that both patents in suit are invalid for obviousness under § 103. As the Supreme Court reminded us in *Graham*, "more ingenuity and skill than that possessed by an ordinary mechanic acquainted with the business[ ]" must be evidenced in a patentable invention. 383 U.S. at 11, 86 S.Ct. at 690. This formulation was first stated by the Court in *Hotchkiss v. Greenwood*, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1851), and has been consistently reflected in the decisions of this court for many years. *See Westwood Chemical, supra*, 445 F.2d at 917 (*Hotchkiss* quoted); *General Metals Power Co. v. S. K. Wellman Co.*, 157 F.2d 505, 509 (6th Cir. 1946), *cert. denied*, 329 U.S. 812, 67 S.Ct. 632, 91 L.Ed. 693 (1947) (something more than the work of a skilled mechanic charged with the state of the prior art); *Vulcan Corporation v. Slipper City Wood Heel Co.*, 89 F.2d 109, 110 (6th Cir. 1937) (some degree of ingenuity . . . not within the reach of mere artisanship). The patents before us do not display that degree of ingenuity and skill required for patentability. The "inherent requisites" of our patent system which derive from the standard of patentability expressed in the Constitution [4] must be present for an inventor to rightfully claim the privilege of a

patent and the marked commercial advantage which inheres. *Graham, supra*, 383 U.S. at 5–6, 86 S.Ct. at 687–88.

The judgment of the district court is affirmed.

---

**4.** "[The Congress shall have Power] . . .

To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries; . . . ." U. S. Constitution, Art. I, § 8, cl. 8.